The next case today is Assured Guaranty Corporation et al. v. Commonwealth of Puerto Rico et al. Appeal number 201930. Attorney Katyal, please introduce yourself for the record. Thank you, Judge Lynch. You may please the court. My name is Neal Katyal. I represent the appellants. You may proceed. I'd like to reserve five minutes for rebuttal. Yes, you may have it. Thank you. The bondholders here put up billions of dollars in capital, and like virtually every other municipal revenue bond, they took a security interest in a stream of future revenues, namely highway tolls and excise taxes. Literally trillions of dollars work this way across the nation. The arrangement benefits governments because it means lower interest rates. It benefits bondholders who are given recourse to a dedicated payment stream instead of exposure to a government's credit risk. The deal was reflected in bond resolutions as well as Puerto Rico statutes, but the decision below toppled all of that, and for three reasons. The bondholders have a property interest here, and the board has to run the table on all three and win each. First, Mr. Katyal, could you just briefly address why the parallel proceeding? Does that provide you with sufficient relief? Absolutely, Your Honor. So 362D just doesn't simply permit it. It doesn't permit deferring. The statute is mandatory. It says the court shall grant relief from the stay if conditions are met, and that mandatory nature reflects Congress's careful balancing. Justice Ginsburg's unanimous opinion for the court in Ritsen is, I think, a good example of this, and indeed, I think, Judge Thompson, it was even recognized in your own separate statement that you joined Judge Kayata last year, in which you said 362D is not a paper tiger and affords a bankruptcy or Title III court no discretion to decline a request for stay relief when the circumstances are met. And Judge Thompson, we think for three different reasons, as our brief explains, contractual lien, beneficial ownership, and statutory lien, those conditions are met. And I think the important point here is all we have to do... Could you answer the question? I'm still trying to figure out from a practical point of view. Sure. We have parallel proceedings where you've just been granted discovery that's well underway, and there will be a resolution. So legally, we think... Are the issues different there than here? They are, Your Honor. So there's a factual problem and a legal problem. I was only talking so far about the legal problem in the text of the statute. But factually, it's a very different thing in Title III. After all, the discovery that has been granted is about counterclaims, which have been stayed. And there's not even an answer or a counterclaim that's actually been filed in those proceedings below. It's in a very different factual posture. And even if the judge below granted everything in the Title III context, this court's decision in Ombach says that Section 305 bars any sort of injunctive or declaratory relief. So even if we got everything there we wanted, they could still suspend down our collateral. And the whole point of 362D, and this is how I started my answer to you, it's all about time. Judge Thompson, there's almost always an adversary proceeding or something else in a 362D. And you can always make the argument, you should defer to that ongoing proceeding. The problem is, and this is what your opinion, where you joined Judge Kayata and the colloquy with Judge Lynch and her separate opinion, it's all about that point, which is 362D, at the end of the day, is a safety valve, precisely for a circumstance like here in which these adversary proceedings go on for a while. I mean, this Title III case was filed in 2017. And the idea that we're going to wait longer and longer, I think, flies very much in contravention of Judge Justice Ginsburg's opinion in Ritson. And indeed, all of the language that this court, on both kind of differing opinions from Judge Lynch and you all in the case last year, 362D doesn't permit you to do that. They're asking the wrong question. And I understand they're afraid to reach the merits because they have to defend a decision below, which said that it is unambiguous, the statutes and the text of the bond resolution. And all we have to convince you of is, nope, there's a colorable claim that we have a property interest. And that is an easy standard to meet. Mr. Kyle, what exactly, if we were to order the stay be lifted, what exactly would happen in the wake of that decision? What would that permit your clients to do? Precisely what I think 362D envisions, which is allow us to file a separate action. Here, likely, it would be under the terms of the statutes in federal district court. And we would seek exactly the kind of As our brief explains, the Puerto Rican government has said they think that these revenues, both the toll revenues, as well as the excise taxes are effectively theirs in perpetuity. And that contravenes with the board themselves said when they were before you in Piaje, as our brief says at page 21, you know, they came to this court and said, nope, there's a perpetual revenue stream that is secured by these future revenues. So don't worry about the bondholders claims. And now they're coming to you and saying the reverse. And that's, I think, per se colorable our claims. I mean, our claims are not different than the ones the board themselves made in Piaje when they were before you. And so your honor, we think that, you know, if we were given 362D relief, we would be able to do exactly what 362D is all about, which is to prevent the diminution in capital. And, you know, the perhaps commingling of funds and other things like that would that would in here. And the district court took the view that, nope, there's no real security here whatsoever, that, you know, the government was supposed to deposit the monies into these into this account. And if they don't, zero security. And that makes no sense. I mean, that means that basically these three billion dollars in loans were backed by precious nothing, just an interest that could be unilaterally extinguished. And I wouldn't lend three thousand dollars to someone that way, let alone three billion dollars. And if you if the deal really said what the district court thinks it did, you'd expect it to say so clearly, as our brief explains. And the SIFMA brief, I think, you know, is very good on this. And they are the nation's experts on these financial instruments that, you know, that industry custom is that there is a revenue stream and that that creates the security. And we think that that is reflected both in the text of the bond resolutions. That's our first argument about Section 401, as well as in the kind of principles of equity and trust. That's our second argument, that there's a trust relationship that develops, that the Commonwealth is merely holding these as trustee and the beneficial owners are the of the resolution. Mr. Kyle, I'm sorry to interrupt on the merits, but going back to Judge Lopez's question, part of what the district court said here was, and FOMB stresses this, we're well along in the adversary proceedings. And the notion that you go start from scratch in another court, whether it's a federal court or a state court, and have some duplication and you want it to be fast, the fastest way of getting it resolved is to complete the adversary proceedings in the Title III court. Just as a practical matter, that does seem to make some sense. Judge Lynch, we think that they're both factual and legal problems with that practical solution. I do understand your legal argument about the word shall and that in some ways, the timing is up to people standing in your shoes as to when they bring these motions. So, but could you explain a little further why that notion is nonsensical here? Sure. So, I mean, it's not just the legal point, it's the practical point that the proceedings below aren't in any advanced stage of proceedings. I mean, no answer has even been filed. The counterclaims in which this discovery would arise have been state. And so, because remember, our point to you here in 362D says, is there a colorable claim? We think on the face of the statutes and the face of the bond resolutions, that's all you need. Discovery is just gravy. That's just another way to prove our point. Weren't you the ones who sought the discovery? Your Honor, we didn't quite seek discovery. This is, of course, their adversary proceeding that they affirmatively came in and filed in the Title III court. Yeah, I know they did. But who sought the discovery here? It seemed to me the discovery was largely for your benefit. Well, what we pointed out, they filed a motion for summary judgment. And in response, we said there are disputed issues of material facts. The judge ordered discovery as a result of that. Our point to you is, of course, with $3 billion in loans, we're going to seek discovery. But this case is fully briefed. It's ready for you to decide. And all you have to decide is, is there a colorable claim? And if there is a colorable claim, then that 362D requires you to grant the relief. And, you know, otherwise, you really are doing it. I understand. But we're still, from a practical point of view, trying to figure out how this advances your particular cause. Because if we find it colorable and lift it, you're talking about instituting a new proceeding as opposed to continuing on with something where at least you're at the discovery stage. Can I just add to your question, Judge Thompson? Maybe I'm missing something basic here, Mr. Katyal. But if you were to proceed with your claims in the District Court or in the Commonwealth Court, and you were able to proceed to a judgment of some kind, what, I mean, certainly that judgment is subject to proceedings in the bankruptcy, in the Title III Court. Is it not? I mean, that would, even if you went to all of that trouble, that would not be the end of the story. You still have to deal with the proceedings in the Title III Court. Isn't that true? Well, I think that the court that we'd file in would have to resolve whether or not we had a property interest. And that would be something that would be disputed maybe with some of the parties before you, like the DRA parties and the like. But the crucial thing, Judge Lopez, is that the 362D would allow that court to grant declaratory and injunctive relief. All the adversary proceeding below is, that's a very limited, stripped-down proceeding in which they're simply to decide whether or not claims exist and whether they can be allowed. And Judge Lynch's colloquy with Judge Kayata before was all about this, about the need for time in bankruptcy disputes. And right now, every day that passes is a day that they are spending our collateral and potentially commingling it. And the adversary proceeding can't stop that. That is your court's decision in AMBAC about Section 305. So the only way that we can prevent a clear and present imminent threat to the diminution of our capital right now is 362D. And that is exactly what Congress had in mind. Remember in Section 301 of PROMESA, Congress expressly incorporated 362D. And what we are doing here... Will Judge Swain necessarily have to decide if you have a property interest? Well, that's her point, is that she has such a limited ability to decide in the adversary proceeding. And the way to get a true resolution of this is to allow the 362D process to unfold. I'm sorry, I don't think you answered the question. You have said no injunctive relief, no declaratory relief can come from the Title III Court. But Judge Thompson's question was about a determination of whether you, in fact, have property interests. That is within the Title III Court jurisdiction, correct? Correct. She would be able to decide the stuff she hasn't already decided. The three arguments we're making to you are on the face of the statutes and the bond resolutions. She's already answered them. Will she necessarily have to decide if you have a property interest? I think that she would have to decide if she was able to get that discovery and lifted the... Remember, the counterclaims have been stayed under her opinion. So I don't know that she necessarily decided. But she has decided these three things against us already, Your Honor. And our point is, these are fully briefed, ready for you to decide now, and we're following the procedure that you told us to do in AMBAC. Okay. Thank you. Thank you, Mr. Katyal. If you could please mute your device at this time, Mr. Mervis. Good morning, Your Honors. Michael Mervis, Proskauer Rose for the Financial Oversight and Management Board of Puerto Rico. As Your Honors are aware, there are certain issues that overlap between this appeal and the appeal that's next on the docket regarding PRFA. And on what Your Honors have been terming the sort of practical issue, I imagine that my partner, Mr. Bienenstock, will have more to say on it than I will. I'm obviously happy to answer questions. But I do want to make a few preliminary observations about that point. Mr. Katyal talks about a factual problem. And I think the way to look at that is this, Your Honors. The appellants made a motion in the Title III Court urging that the standard was the colorable claim standard under GRILLA, seeking a speedy proceeding and asking for one of two things, either a determination on the merits in another court or adequate protection. What's happening right now in the district court, there is no factual problem. Yes, answers haven't been filed. But summary judgment motions on exactly the same issue that this court is now being asked to render an opinion on, which is do the appellants have Judge Swain has now granted a 52D motion to allow for discovery. And so the record that she's going to decide their property interest issue on will be much more robust than the record that the appellants, by invoking the GRILLA standard, urged below. So there is no factual problem. The other point I would make, and I think that Your Honors have already made it, but the notion that this is about time does not make any sense. If anything, Judge Swain has shown that she is committed to moving proceedings in her court as quickly as possible. What will happen if the stay is lifted is that the appellants will be able to move proceedings as quickly as possible. So I have no idea what the pace of that case will be. But I can tell you this much, it won't start with fully brief summary judgment motions and a record of discovery. And again, I'll defer to Mr. Bean and Stock for further comment on this because I'm quite sure he'll have it. So unless there are any questions on this point, I'd like to provide an overview on the property interest. Just tell me, how do we deal with the shall language? Maybe that seems too simplistic, but why don't you tell us why we think shall does not mean shall? Well, I think there's two answers to that, Your Honors. So the shall language doesn't mean that the stay needs to be terminated. That's not what's required. The shall under 362E, I believe it is, if the Title III Court determines to lift the stay, it can be terminated, it can be conditioned, it can be modified. And I think the point that I would make, so in other words, it doesn't require giving the appellants what they're already getting. In other words, sending them to another court when they're getting a marriage decision on property interest from the Title III Court. The second point I'd make is that this motion is up on an abuse of discretion standard. It can't be an abuse of discretion for the Title III Court to deny the termination of the stay when the Title III Court is actively adjudicating the property interest, which again, is exactly what the appellants asked for. And the only issue is, will we prefer to go to another judge? It's very hard to imagine how it could be an abuse of discretion to judge shall. And again, Mr. Bienenstock may have more thoughts on that, but that is my response. Mr. Katyal opened his presentation by talking about the district, how the Title III Court has upended established practice and the like. I do want to make one comment before I get to my point, which is, Mr. Katyal mentioned interest rates and talked about how revenue bonds have lower interest rates than others. Whether that is so with respect to other revenue bonds, there's not- Five minutes remaining. Thank you. There's not a stitch of evidence in this record before the court as to how the bonds relate to other revenue bonds. So what may or may not be so as a general matter, there's no evidence of that here. That is evidence that if it exists, can be developed in the Title III Court and the adversary proceedings, but it's not before your eyes. Now, let's assume for the sake of argument that there is a norm when it comes to what people call revenue bonds. Of course, there's a basic point, which is that industry custom and practice doesn't control or isn't even relevant when the terms of the bond documents at issue are clear. They have to be enforced as written. The fact that they're different than the norm doesn't mean that they're wrong or that the court should rewrite them. But, and I say this particularly with respect to the excise taxes that are at issue, there are some fundamental differences between this situation and every other situation and every other case that was cited by the appellants to this court that fully explain why the bond in her preliminary determination on a limited record that the culpable claim standard had not been met. First and foremost, the bond issuer here is not the party that's actually raising the taxes. The bond issuer here is HTA. The taxing and appropriating authority is the Commonwealth. And the Commonwealth did not cede or delegate its taxing authority to HTA. More importantly, and there's no dispute about this, every bond document, every statute that's before this court says one thing that's very clear, the monies that are appropriated by the Commonwealth under these excise tax statutes are available resources that can be used and retained by the Commonwealth under appropriate circumstances. That's not a feature found in any of the cases cited by the appellants. I don't know if it's unique in the world, but it is the facts that we have here. And just to digress for a moment, it's completely inconsistent with the notion that there's a trust here. If the money can be used for more than one purpose, depending on the circumstances, there isn't a trust. Counsel, can I just, on this culpable claim issue, which frankly doesn't sound like a very demanding standard. I mean, we have this, it might seem rather arcane debate, looking at the language of the trust resolution between the last antecedent rule and the serial qualifier rule. I mean, there are competing arguments there and we read these briefs and we get these kinds of compelling arguments on both sides and the resolution is not easy. Why doesn't that almost by definition suggest there is at least a culpable claim here? So, two things, Your Honor. First is, I want to be clear, that issue, in other words, those competing interpretations of the bond resolutions has nothing to do with the Commonwealth and the excise tax statutes. The resolutions are between HTA and the bondholders. Commonwealth is not a party to them. So, I think that's an important thing to surface in the first instance. The second point I'd make is, we will acknowledge that these could have been drafted better. They're not the easiest documents in the world to read at because something could have been drafted better. It doesn't mean that it's ambiguous. Time has expired. Go ahead and answer. Yes, it doesn't mean it's ambiguous and I believe in our papers that we've explained why, and I understand Your Honor's reaction to sort of a ping pong, right? You read one brief, you read the other, but I think if you lay them out, ultimately, what the district, what the one is a lot more plausible than the other, and that means that they didn't satisfy the colorable claim standard. So, I have a question. Yes, Your Honor. In your argument, you characterize the district court's ruling that there was no colorable claim as a preliminary ruling. Now, if I were your opponent, I would be very worried about the fact that she has said, gosh, your claims of property interest are not colorable, but I'm going to go ahead and decide the issue of property interest after I get a bit more discovery, and under those circumstances, it's hardly irrational for them to try to do a bit of judge shopping, which you also referred to. So, does the district court's no colorable argument conclusion foreclose it from finding that the bondholders have any property interests here? No, not at all, Your Honor. First of all, I agree. If I were Mr. Koch, I'd have the same concerns, but the answer is no, and the reason is it's actually exemplified by the 52D order that was provided to this court by the appellants. It's a different record. There are facts that the Title III court may not have known about that may lead to a different result. We don't know. We think, and obviously that's why we move for summary judgment, that we're right and we should win as a matter of law. We think that we will win as a matter of law after all the discovery is done, but I don't think that there's a real concern or a concern that warrants this court delving into the merits when it doesn't have to, that Judge Swain is incapable of changing her mind if evidence is presented to her that warrants her changing her mind. So, even though she didn't view it as at the time, that's not a static ruling that can't be influenced by whatever proceedings with discovery might follow. I would analogize it to a preliminary injunction proceeding. I think that, look, it's a typical preliminary injunction proceeding. There's a decision and then, whether or not the parties settle, there's eventually a full plenary trial on the merits. Sometimes the court comes out the same way, sometimes the court doesn't. It's the difference between having a limited record and a full record. Just very quickly, if I might, just as a point of entry, you made a reference in your argument to the clawback provision in the Enabling Act, I believe. Is there a factual dispute or basis for a factual inquiry as to how the Commonwealth is using these revenue streams that have no longer been made available to the bondholder? Is that an area of factual inquiry? Your Honor, if I think I understand your question, and I hope I do, there is a dispute, and that dispute is in front of the Title III Court right now, as to whether the Commonwealth, through the Board's fiscal plans, appropriately retained the revenues pursuant to Article VI, Section 8 of the Puerto Rico Constitution. There's not a record sufficient for this court to delve into it because it wasn't really developed, but that is an issue that is teed up, and depending on how the Title III Court decides the summary judgment motions, if they're denied or denied in part, they will be litigated to conclusion. All right, all right. Thank you. Thank you, Mr. Mervis. Thank you, Mr. Mervis. At this time, you can mute your audio and video. Attorney McKean, you have a three-minute argument, Allotman. Please introduce yourself on the record. Thank you. Good morning. May it please the Court, Elizabeth McKean of O'Melveny and Myers for a brief introduction. I'm going to start with a very brief argument, but important, and that's when the government of Puerto Rico wants to alienate its assets or create a trust, it does so expressly. Now, Mr. Cotillard remarked that if the bonds were backed by nothing, you'd expect something to say so, but the truth is that if the statutes here were intended to create a trust, you'd expect them to say so, because that's what the Commonwealth of Puerto Rico does when it creates trusts. In the case of HTA, section 31751A1G makes that point pretty crystal clear. That section would have expressly transferred a property interest in the HTA allocable revenues to HTA. It would have also created a trust in favor of the bondholders if it had ever become effective, which everyone agrees never happened. That section provided that on the relevant effective date, certain revenues, quote, shall belong to HTA for the benefit of the holders of the bond, and it went on to say that to the extent any other Commonwealth entity held those revenues before the bonds were repaid, that that entity, quote, shall hold such revenues in trust for the benefit of HTA, but the monolines don't dispute that the effective date never occurred and that provision never became effective. They say the provision's not instructive because it was enacted later than some other provisions of the statute, but there would have been no reason for that provision to exist at all if the statutes directing transfer of the HTA revenues to HTA for its corporate purposes gave the monolines the rights that they now claim. The definition of the effective date in the statute makes clear that the Commonwealth legislature didn't intend to and they concededly were not met here. The language of the section underscores that when the Commonwealth intends to transfer ownership, it does so explicitly. When it intends to create a trust, it does so explicitly. It says if the preconditions are met, revenues belong to HTA for the benefit of the bondholders. It doesn't say shall be covered into a special deposit for HTA for its corporate purposes, and it certainly doesn't say there's going to be a trust even if these conditions aren't met. There's similar unequivocal language in the provisions that transfer ownership of sales and use tax revenues in the post restructuring COFINA statute that was While statutory language doesn't have to be that unequivocal to accomplish the task, here the statutes allocating revenue to HTA don't have language that looks anything remotely like this. They say things like the taxes shall be covered into a special deposit, but the money shall be transferred. The language doesn't transfer ownership. These are the Commonwealth revenues and these are appropriation statutes. Time has expired. Unless the court has any questions. Thank you. Thank you. Attorney McKean, you should mute your device at this time. Attorney Dupin, please introduce yourself on the record. Good morning judges. Luke Dupin with Paul Hastings on behalf of the official committee of unsecured creditors. I have two minutes, therefore I'll try to hit my points very quickly. The first one dovetails into what Ms. McKean was talking about. It's really important to focus on the fact that there are three parties involved here, bondholders, HTA, and the Commonwealth. The reason I'm raising this is because it goes to the practical question the three of you raised. Let's assume you were to lift the stay as the appellants would want you to do. Think about something that has been completely glossed over by the appellants here, which is the fact that you have HTA and the Commonwealth. HTA clearly made promises to the bondholders. The Commonwealth made promises to HTA, but what is the nature of those promises? Are the appellants going to sue in the name of HTA against the Commonwealth? There's a whole procedural morass there of letting that litigation go forward outside of the title three court. I think it's important to understand that three-party relationship. That's not an accident, by the way. The Commonwealth did not want to be the issuer of these bonds because the Commonwealth had a limit on what they could issue in terms of bonds. A secured creditor, if they want to be secured or get that here because of that tension where the Commonwealth is saying, okay, I'll promise that I'll send money over to HTA, but I'm not making a promise to you bondholders and I'm not giving you a lien on my assets. That's fundamental. This is really a reminder of the ERS case in a sense that in ERS, it's the same argument that was made, which is, hey, how could it be that we have lent billions of dollars and be unsecured? That can't be. All the arguments are made in that context. The last point I would make very quickly is that on the estoppel, the appellants argued that the oversight board is bound by estoppel because of the PIA decision. That cannot apply to the committee. The committee did not exist at that time. The committee's position here is not derivative of the Commonwealth. We have, as a party in interest, the right to object, not through the board, but an armed right. Thank you. Thank you. Thank you, Mr. Tepin. You can please mute and at this time, Attorney Garcia Solak, if you could please unmute your device and you have a three-minute argument. Yes, may it please the court, good morning. Arturo Garcia from McConnell Valdez on behalf of the interested parties appellees, the servicer and the collateral monitor for the GDB debt recovery authority. Board of counsel Douglas Mintz is available for questions at the end if the court has any to the collateral monitor. The DRA has an interest in this appeal because as the surviving entity to the former GDB, it has a property interest in the excise tax revenues at issue in this appeal because it holds 23 loans given to the HTA by the GDB amounting to more than $1.7 billion, which are collateralized by those revenues. The DRA also holds more than 200 million in HTA bonds. We have three statements to make. The first is the court should not determine the property interest over the excise taxes in this appeal. That was an issue that was not resolved by the title three court and therefore is not property before this court. However, if the court were to enter into such an issue, we ask the court to at least hold that with respect to HTA, HTA did have a property interest over those excise taxes. And why do I say that? First of all, the pertinent statutes do not leave, I think Judge Lopez, you were looking into this, do not leave any discretion on the Commonwealth to transfer those revenues to HTA. They actually provide that the revenues must be transferred. Second, the excise tax revenues must continue for that matter, must continue to be transferred to HTA pursuant to section nine of the Puerto Rico constitution, which provides that, and I quote, public property and funds shall only be disposed of pursuant to law. The statutory requirement to transfer the excise taxes to HTA is not a budgetary appropriation. And I beg to differ with sister counsel from AFAS and is therefore not subject to the annual budget process of the Commonwealth. Counsel, excuse me, I may ask you a question, please. I'm looking at page 20 of your brief. I hope I have the right party here, but there's an interesting statement there, which is, and it says, unlike the bond resolutions, and you're distinguishing your security agreement from that relied upon by the clients of Mr. Katyal, you say that unlike the bond resolutions, the security agreement pledges to GDB an interest in the excise tax revenues without qualification, quote, whether presently held or hereafter acquired and wherever located. I gather you're making the point that if the bondholders had language like that, they would be in a much stronger position to argue that they indeed have had pledged revenues that were not dependent upon whether excise taxes or tolls were deposited into a sinking fund. That this language would preclude that kind of argument. Do I read your argument correctly? Well, you're reading us correctly in part, Your Honor. First of all, we are not stating any position with respect to whether the language, but we are saying, we are saying, Your Honor, and I think you've hit on an important point, that the security interest for both the parties are very different, and that is so because they emanate from different documents. In the case of the DRA, Your Honor, you're correct. There is a security agreement, an assignment and security agreement, which provides important part of that, and I quote, the HTA absolutely irrevocably and unconditionally assigns, conveys, and transfers to GDB all of the excise tax revenues. The agreement further provides that as security for the prompt and complete payment and performance of its obligation, HTA, quote, assigns, pledges, and grants to GDB a continuing security interest in the excise tax revenues, whether presently held or hereafter. Mr. Garcia, unless you need to keep going, you're getting into the weeds after your initial argument was, don't get into the weeds, so there's some tension here. Judge Lopez, do you have further questions? I apologize if I dragged you into the weeds, counsel. Yes, I appreciate your response. Okay, thank you. Do you have any further questions? Not, no, no. Thank you. Thank you, Mr. Garcia. Mr. Garcia, you may mute your audio and video at this time. Attorney Katyal, if you could unmute your device, you have a five-minute rebuttal. This is Neil Katyal again, and I have three points. First, my friends have an extraordinary burden. As Judge Lopez just pointed out, to rule for us, all you have to decide is that we have a colorable claim that's manifest on the text of the resolutions and the statutes, and our view is by definition colorable, as it was my opponent's own view last time. Take a look at the board's Piaget brief in minutes 57 and 61 of the oral argument, and the most his arguments today get is that the statute's operative text might have some ambiguity. That comes nowhere close to defending what he must, the title three's conclusion that the statutes and resolutions are unambiguous on all three theories. If there's doubt, it's colorable, and we win. They can't defend that, yet they want you to defer to it, which is final and conclusive. Judge Swain has decided it. She's rejected all three of our theories, and it's not like a preliminary injunction. She's decided these. Now, there might be a fourth theory on which we'd win based on discovery. That's not at all, as my friend from the board called it, exactly the same issue. That's about extrinsic evidence and understandings. It's kind of like the difference between 12b-6 and summary judgment, where if more than four years into the title three proceedings, she's rejected the three main theories. Now, Judge Lopez, you asked about the shall language. My friend didn't answer it at all. He just said that doesn't require the stay be terminated. That's wrong. The language of 362, court shall grant relief from the stay. So practically, if you ruled for us and lifted the stay, we could then file for an immediate TRO and seek expedited proceedings. It'd be quick and streamlined because there'd be no need for discovery. Our claims are facial, and this court has already held that section 305 prohibits the title three court from doing any of that and granting us any effective relief, even if that court ultimately found for us on the law. This isn't judge shopping. It's about seeking a forum that is capable of giving relief. And Judge Lynch, it's clearly an abuse of discretion. This court's decision in gracia gracia said it's an abuse of discretion to deny stay relief based on an erroneous adjudication of interest. And here, if you ruled against us, it'd mean they can keep the revenues now, spend it, commingle it, dissipate it, and we would have zero remedy. That's what Congress in 362D is all about. That's the first point. Our second quick point is that ours is a more measured approach. The board is claiming the power to use these funds now, potentially dissipating them, making them hard to trace and the like, while the title three process is ongoing. And as this court emphasized in Grella, 362 is all about time and moving quickly to protect colorable claims to a property interest. And then finally on the merits, their argument amounts to nothing more than trying to win on a technicality. It's gotcha-ish. They're asking the court to perform verbal gymnastics and reading the statutes and resolutions to avoid the standard market expectation for bonds like this. The SIFMA brief, Judge Lynch's opinion last year about this is all very clear that the standard way of doing these contracts is exactly what this is. And they are billions of dollars with no security interest whatsoever. Even the most fly-by-night payday lenders recognize when there's no security, interest rates have to go through the roof. Nothing like that happened here. Instead, everything suggests this was like a standard revenue bond. The bondholders received a contractual lien, just like every other revenue bondholder. And the bondholders bought these bonds knowing that the statutes provided them an additional interest in the excise taxes. Do you agree that if the bond resolution contained the kind of language that I just quoted from the GDB brief, that you would be in a much stronger position to argue that the pledged revenues were not contingent on what HTA or deposit into the sinking fund? Well, that would be gravy. We certainly don't need it, Your Honor. And I think many bond resolutions don't. But here, of course, you can start with the preamble, which does have language, which looks very similar to the language you're reading. And the whole way of reading sections 401 and 601, ours is the only theory that says that there was actually a lien that was attached from the moment it started. And then that lien continues in when the funds are given to the fiscal agent. They work together. By contrast, they've never been able to explain what 601 does if their 401 theory is true. Now, I'll grant you these are all very technical and complicated arguments. But you'd expect if the bond was to look different than every other municipal bond. Time has expired. If I might just finish with the possible exception of that one case Las Vegas revenue, it would say so clearly. Industry custom and practice say the reverse. It is certainly colorable. Thank you. Thank you, counsel. That concludes the arguments in this case. Attorneys who are staying for the following argument should remain in the meeting. Attorneys who have completed their argument today should leave the meeting.